# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Southern Division)

| | | |
|---|---|---|
| STRATAGENE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-3603 (WMN) |
| | ) | |
| TAKARA HOLDINGS, INC. and | ) | |
| TAKARA BIO, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF STRATAGENE'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO (1) QUASH SERVICE OF PROCESS, (2) DISMISS FOR INADEQUATE
SERVICE OF PROCESS, AND (3) DISMISS FOR LACK OF PERSONAL
JURISDICTION, OR (4) - IF THIS COURT HAS JURISDICTION - TRANSFER**

Marc R. Labgold
Kevin M. Bell (MD Bar # 14382)
Scott A.M. Chambers
PATTON BOGGS LLP
8484 Westpark Drive
McLean, Virginia 22102

Richard J. Oparil (MD Bar # 13063)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037-1350

*Attorneys for Plaintiff Stratagene*

Dated: May 1, 2003

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ...............................................................................................1

II.   BACKGROUND FACTS & PROCEEDINGS ..................................................1

III.  ARGUMENT .....................................................................................................8

      A.    Takara Was Properly Served Pursuant To The Federal Rules of Civil Procedure And The Hague Convention .........................................................8

            1.    Article 10(a) Provides For Service By Mail To Japan................................8

            2.    Takara's Construction Argument Is The Epitome Of Semantics .............11

      B.    Stratagene Has Presented *Prima Facie* Evidence Of Personal Jurisdiction .........14

      C.    Takara Has Failed To Present A Legitimate Basis For Transfer ...........................18

IV.   CONCLUSION ...............................................................................................20

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Ackerman v. Levine*, 788 F.2d 830 (2nd Cir. 1986) .....................................................................10

*Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 192 (D. Del. 1998) ...........................................20

*Bering Diagnostics GmbH v. Biosite Diagnostics, Inc.*, No. 97-501MMS, 1998 WL 24354 (D. Del., Jan. 6, 1998) ............................................................................18, 19, 20

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994) .......14, 15, 16, 18

*Braley v. Sportec Products Co.*, No. 01-333-JD, 2002 WL 1676293 (D.N.H., July 16, 2002) ..............................................................................................................................16

*Brown v. Bandai America, Inc.*, No. 3-01-CV-0442-R, 2002 WL 1285265 (N.D. Tex., June 4, 2002) ..............................................................................................................10

*Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*, 166 F. Supp. 2d 432 (D. Md. 2001) ...........14

*Chrysler Corp. v. General Motors Corp.*, 589 F. Supp. 1182 (D.D.C. 1984) ..............................10

*Dow v. Jones*, 232 F. Supp. 2d 491 (D. Md. 2002) ..................................................................18

*EOI Corp. v. Medical Marketing Ltd.*, 172 F.R.D. 133 (D.N.J. 1997) ............................10, 11, 13

*Eli Lilly and Company v. Roussel Corp.*, 23 F. Supp. 2d 460 (D.N.J. 1998) .........................10, 12

*Gapanovich v. Komori Corp.*, 605 A.2d 1120 (N.J. Super. Ct. App. Div. 1992)....................10, 13

*Hammond v. Honda Motor Co., Ltd.*, 128 F.R.D. 638 (D.S.C. 1989) .........................................10

*James v. Victor Co.*, 48 U.S.P.Q. 2d 1789 (D. Md. 1998)..........................................................16

*Jordan v. Septa*, 708 A.2d 150 (Pa. Commw. Ct. 1998) ...........................................................10

*Koehler v. Dodwell*, 152 F.3d 304 (4th Cir. 1998) ..................................................................10

*Kollmorgen Corp. v. Yaskawa Electric Corp.*, 169 F. Supp. 2d 530 (W.D. Va. 1999).....16, 17, 18

*Miller Pipeline Corp. v. British Gas*, 901 F. Supp. 1416 (S.D. Ind. 1995) ................................19

*Motorola, Inc. v. PC-Telegraph, Inc.*, 58 F. Supp. 2d 349 (D. Del. 1999).............................16, 17

*Nicholson v. Yamaha Motor Co., Ltd.*, 566 A.2d 135 (Md. Ct. Spec. App. 1990), *cert. denied*, 569 A. 2d 1242 (1990) ........................................................................................10, 13

*Patty v. Toyota Motor Corp.*, 777 F. Supp. 956 (N.D. Ga. 1991) .................................................10

*Penn-Plax, Inc. v. L. Schultz, Inc.*, 988 F. Supp. 906 (D. Md. 1997) ....................................18, 19

*R. Griggs Group Limited v. Filanto SPA*, 920 F. Supp. 1100 (D. Nev. 1996) ............10, 11, 12, 13

*Randolph v. Hendry*, 50 F. Supp. 2d 572 (S.D. W.Va. 1999)........................................................10

*Rich v. KIS California, Inc.*, No. C-87-801-WS, 1988 WL 47605 (M.D.N.C. 1988) .............10, 12

*Rissew v. Yamaha Motor Co., Ltd.*, 515 N.Y.S.2d 352 (N.Y. App. Div. 1987) ...........................10

*Schiffer v. Mazda Motor Corp.*, 192 F.R.D. 335 (N.D. Ga. 2000) ..................................10, 11, 13

*Sonoco Products Co. v. Inteplast Corp.*, 867 F. Supp. 352 (D.S.C. 1994)...................................16

*Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996)...............................................................................11

*Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694 (1988) .........................................11

*Weight v. Kawasaki Heavy Industrial, Ltd.*, 597 F. Supp. 1082 (E.D. Va. 1984) ..................10, 13

## STATUTES

20 U.S.T. 361 ...................................................................................................................................8

28 U.S.C. § 1404..............................................................................................................................1

28 U.S.C. § 1404(a) .......................................................................................................................18

28 I.L.M. 1556 (1989)....................................................................................................................13

30 I.L.M. 260 (1991)......................................................................................................................11

35 U.S.C. § 256................................................................................................................................7

35 U.S.C. § 271(a) ...........................................................................................................................5

35 U.S.C. § 271(b) ...........................................................................................................................5

Fed. R. Civ. P. 4(d) ...........................................................................................6, 7

Fed. R. Civ. P. 4(f) ............................................................................................7, 8

Fed. R. Civ. P. 4(h) ...........................................................................................7, 8

Fed. R. Civ. P. 12(b)(2)......................................................................................1, 20

Fed. R. Civ. P. 12(b)(5)......................................................................................1, 20

## <u>MISCELLANEOUS</u>

Alexandria Amiel*, Recent Developments in the Interpretation of Article 10(a) of the
    Hague Convention on the Service Abroad of Judicial and Extra Judicial Documents
    in Civil or Commercial Matters*, 24 Suffolk Transnat'l L. Rev., 387 (2001)..........9, 11, 13, 14

Maxim V. Myakishev, et. al., *High-Throughput SNP Genotyping by Allele-Specific PCR
    with Universal Energy-Transfer-Labeled Primers*, II Genome Research 163 (2001).........4, 17

The Practical Handbook on the Operation of the Hague Convention of 15 November
    1965 on the Service Abroad of Judicial and Extra Judicial Documents in Civil or
    Commercial Matters (Hague Conference on Private International Law) (1992) ...................11

## I.    INTRODUCTION

Defendants Takara Bio, Inc. ("Takara Bio") and Takara Holdings, Inc. ("Takara Holdings") (collectively "Takara") have moved this Court to (1) quash or dismiss for inadequate service of process pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure, (2) dismiss the instant action for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, or (3) transfer the instant action to the United States District Court for the Southern District of California, which Takara alleges is more convenient, pursuant to 28 U.S.C. § 1404.  Takara's motion should be denied because (1) Stratagene has properly served Takara on March 24, 2003, pursuant to the Hague Convention, (2) Stratagene has presented *prima facie* evidence that Takara is subject to both general and specific jurisdiction in this forum, and (3) Takara has failed to demonstrate that transfer is either appropriate or nonmaterial.  (Mem. at 1).[1]  Takara's motion should be denied.

## II.    BACKGROUND FACTS & PROCEEDINGS

Stratagene originally filed the Complaint in this action on November 4, 2002.  As indicated in greater detail below, Stratagene has diligently attempted to open a dialogue with Takara and its counsel in an effort to resolve this matter in advance of litigation.  Both before and after the filing of the Complaint, but before effecting service, Stratagene has patiently endured Takara's unwillingness to engage in meaningful discussions.  Takara's most recent filings in this Court and its contemporaneous filing of a separate complaint directed to the same subject matter in a California court, demonstrates that Takara's true intention was to stall these proceedings to its own advantage.  Such gamesmanship should not be condoned by this Court.

---

[1]    Takara's Memorandum in Support of Its Motion to (1) Quash Service of Process, (2) Dismiss for Inadequate Service of Process, and (3) Dismiss for Lack of Personal Jurisdiction, or (4) - If This Court Has Jurisdiction - Transfer is identified herein as "Mem."

As admitted by Takara, Takara Shuzo Co., Ltd., was a Japanese company engaged in the business of making and selling sake (an alcoholic beverage) and enzymes used in biotechnology.  As of April 1, 2002, Takara Shuzo Co., Ltd. became a holding company, Takara Holdings, Inc., and divided its operating businesses into two subsidiaries -- Takara Bio and Takara Shuzo, Inc.  (*Id.*)  Takara has indicated that Takara Bio received the biotechnology-related business and Takara Shuzo, Inc. received the sake business.[2]  (*Id.*)

Takara sells its biotechnology and sake products worldwide.  Takara sells its biotechnology products throughout the United States through at least three established distribution channels:  (1) Takara Mirus Bio, formerly known as Panvera, now a subsidiary of Takara Shuzo Co., Ltd, located in Madison, Wisconsin (*see, e.g.,* http://www.takaramirusbio.com/corp.htm, a copy of which is attached hereto as Ex. A); (2) Fischer Scientific International, located in Pennsylvania (*see, e.g.,* https://www1.fischersci.com/pcr/Products/enzymes.jsp, a copy of which is attached hereto as Ex. B; *see also* Declaration of Lynn D. Hudson, Ex. C); and (3) Serologicals Corporation, located in Georgia; (s*ee, e.g.,* http://www.serologicals.com/products/int_prod/body_pcr_takara.html, a copy of which is attached hereto as Ex. D).  Serologicals Corporation was formerly known as Intergen.  (*See* http://www.intergenco.com/body_news.html, a copy of which is attached hereto as Ex. E (showing Intergen's new facility in Gaithersburg, Maryland)).

Takara sells sake in the United States through Takara Sake USA, Inc. -- established in 1982 in California as a subsidiary of Takara Shuzo Co., Ltd.  (*See, e.g.,* http://www.sakeusa.com/sake/members/Revise/MembersHTML/Takara.html, a copy of which is

---

[2]     Takara's papers indicate that the Confirming Agreement transferring intellectual property assets such as U.S. Patent No. 5,436,149 from Takara Holdings, Inc. to Takara Bio was not signed until March 28, 2003, four days after Stratagene served Takara.  (Mem. at Ex. 2).

attached hereto as Ex. F).  Takara Sake USA, Inc. sells its products throughout the United States by numerous distributors, including the National Dist. Co. for sales in the State of Maryland.  (*See* http://www.takarasake.com/distributors/distributors.htm, a copy of which is attached hereto as attached as Ex. G; *see also* Declaration of Jasemine C. Chambers, Ex. H).

Plaintiff Stratagene is a corporation organized under the laws of the State of Delaware, with its principal place of business in La Jolla, California.  As detailed in the Complaint, Stratagene is the sole owner of U.S. patent number 5,556,772 entitled "Polymerase Compositions and Uses Thereof ("the '772 patent").  In general terms, the claims of the '772 patent are directed to so-called "polymerase blends" -- mixtures of particular enzymes having particular characteristics and which are useful in biotechnology research.  Of particular note, Stratagene's invention has greatly increased the ability to perform PCR of longer DNA molecules and at a higher fidelity rate in general.[3]  These blends are comprised of a first DNA polymerase enzyme known as "Taq" and a second DNA polymerase which possesses a so-called proofreading function commonly referred to as "exo."  Stratagene has had a relationship with Takara for several years.  At present, Stratagene pays royalties to Takara for a license under U.S. patent number 5,436,149 ("the '149 patent").[4]  (Mem. at 3).  The royalty stream has been based upon the sales of "polymerase blends" having a particular ratio of components.

Stratagene's '772 patent is a dominant patent which is significantly broader than the '149 patent in that it generically covers polymerase blends (*e.g.*, it is not limited to the narrow range of ratios claimed in the '149 patent).  Moreover, while the patent application which led to the '149 patent was

---

[3]    "PCR" is an abbreviation for "polymerase chain reaction," a commonly used technique for amplification of DNA molecules.  This technique has wide applicability in biotechnology in general and has become generally known for its application in forensic sciences.

[4]    The sole applicant identified on the '149 patent is Wayne M. Barnes.

filed before Stratagene filed its patent application for the '772 patent, the undisputed evidence shows that Stratagene conceived of and reduced to practice the polymerase blend invention several years before Wayne Barnes.

Currently, Takara is selling a line of products which incorporate and/or are encompassed by the claims of Stratagene's '772 patent.  For instance, Stratagene is aware of two polymerase blend enzymes (and corresponding kits) known as Takara Ex Taq and Takara La Taq.  Takara distributes these infringing products throughout the United States, including the State of Maryland, through at least three of its established distribution channels:  (1) Takara Mirus Bio; (2) Fischer Scientific International; and (3) Serologicals Corporation (formerly Intergen).  (*See* Exs. A, B, D; *see also* Maxim V. Myakishev, et. al., *High-Throughput SNP Genotyping by Allele-Specific PCR with Universal Energy-Transfer-Labeled Primers*, II Genome Research 163, 168 (2001) (describing work performed using a Takara Taq polymerase product that was conducted by Intergen and the National Institutes of Health ("NIH") of Maryland, a copy of which is attached hereto as Ex. I).  In addition to distributing the infringing products through the normal channels of trade, Takara and its distributor also have interactive websites, some of which allow direct purchasing over the internet.  (*See, e.g.*, Exs. B, C).

 Months prior to the filing of the Complaint, Stratagene's counsel contacted Takara Bio to initiate a discussion regarding Stratagene's offer to license the '772 patent to Takara, the invalidity of the '149 patent in view of Stratagene's prior invention, and each of the parties' pending patent applications that are currently subject to review for interference.[5]  (August 27, 2002 letter from Marc R. Labgold to Kazuki Yamamoto, at 1-2, a copy of which is attached hereto as Ex. J).  In response, Takara

---

[5]    An interference is a U.S. Patent Office proceeding designed to determine the priority of invention, *i.e.*, to determine who first invented the claimed subject matter.  Under U.S. law, a patent is issued to the first inventor of an invention, which is not necessarily the first individual that files an application for a patent.

requested a little more than a month to consider Stratagene's position and indicated it would be

necessary for it to speak with Dr. Barnes. This request was granted, yet despite repeated attempts by

Stratagene and its counsel to contact Takara through Stratagene's Japanese counsel, Takara consistently

put off engaging in any discussions.

In the face of Takara's recalcitrant maneuvers, Stratagene filed the instant Complaint on

November 4, 2002, and forwarded a courtesy copy to Takara Bio.[6] (*See* November 4, 2002 letter from

Marc R. Labgold to Kazuki Yamamoto, at 1) (attached as Ex. K). However, Stratagene did not serve

this Complaint "in order to allow the parties the opportunity to reach an amicable settlement of this

matter in advance of incurring substantial litigation expenses." (*Id.*)

Again, Takara continued its stall tactics. (*See* November 11, 2002 letter from Marc R. Labgold

to Shigetoshi Hirano, at 1-2) (requesting meeting to resolve the instant litigation) (attached as Ex. L);

(November 25, 2002 letter from Marc R. Labgold to Shigetoshi Hirano, at 1) ("To date, I have received

no reply to my November 11 letter.") (attached as Ex. M). Takara then retained the law firm of Fish &

Richardson to advise it for the instant litigation. (*See* December 2, 2002 letter from John B. Pegram to

Marc R. Labgold) (attached as Ex. N).

As part of the discussions, Stratagene's counsel asked Takara's counsel if Takara would agree to

accept service in the event that settlement could not be reached -- given that the time to serve Takara

was running, it would be necessary to initiate formal service of the Complaint. (January 23, 2003 letter

from Marc R. Labgold to John B. Pegram, at 1) (attached as Ex. O). At that point in time, the parties'

negotiations were focused on creating a confidentiality agreement whereby Stratagene would provide

---

[6]     The complaint in the instant action charged Takara with direct infringement of the '772 patent pursuant to
35 U.S.C. § 271(a) and indirect infringement pursuant to 35 U.S.C. § 271(b).

5

Takara access to the evidence of Stratagene's prior invention of polymerase blends as compared to the '149 patent. Takara's counsel also indicated Takara's possible willingness to proceed on the basis of a Rule 4(d) waiver of service. Stratagene indicated its willingness to do so under appropriate terms of confidentiality given the fact that these proofs included Stratagene's confidential research and development documentation. (*See* the Declaration of Marc R. Labgold, Ph.D. ("Labgold Decl.") at ¶¶ 2, 4, a copy of which is attached hereto as Ex. P). The parties then proceeded to engage in discussions over the appropriate terms of confidentiality. Due to both Stratagene and Takara's counsel's travel schedules, several weeks passed without significant progress. In its continuing effort to resolve this matter without bringing it before the court or expending significant resources, Stratagene agreed to move to extend the time to serve Takara with the Complaint and Summons, which was granted by this Court, thus allowing Stratagene to have up to and including June 2, 2003, to effect service of the Complaint and Summons on Defendants.

On March 12, 2003, counsel for the parties conducted yet another telephone conference to discuss the parameters for the terms of confidentiality and the particular documentation which would be disclosed thereunder. Stratagene's interference counsel, M. Paul Barker of the firm Finnegan, Henderson, Farabow, Garrett & Dunner, also participated in this call. (Labgold Decl. at ¶ 3). During this call, Takara's counsel, Mr. Pegram indicated that he would not agree at that time to waive service pursuant to Rule 4(d) Fed. R. Civ. P. (*Id.* at ¶ 5). Stratagene's counsel indicated that if Takara would not agree in face of the running deadline to serve the Complaint, it would be necessary to effect formal service. (*Id.* at ¶ 5). Stratagene's counsel also indicated Stratagene's concern that Takara was simply seeking to delay the proceeding and indicated that if Takara was unwilling to waive service and receive the benefits under Rule 4 for such waiver, Stratagene would immediately take actions to formally serve

6

the Complaint.  (*Id.* at ¶ 5).  Stratagene's counsel also indicated that once the effort to serve had been

undertaken, Stratagene would not be willing to entertain further extensions of time.  (*Id.*).  Takara's

counsel maintained its refusal to accept service on behalf of its client.

On March 24, 2003, Stratagene's counsel served the Summons and Complaint for the instant

action upon Takara in Japan by registered mail, pursuant to the requirements of Rule 4(f) and (h)(2) of

the Federal Rules of Civil Procedure and the Hague Convention.  Upon receipt of service, Takara's

counsel informed Stratagene's counsel that Takara was now "willing to proceed under the waiver

procedure under Rule 4(d)" if Stratagene would send Takara the waiver request and waiver form.

(March 28, 2003 letter from John B. Pegram to Marc R. Labgold, at 1) ("You need not send them

another copy of the summons and complaint.", a copy of which is attached hereto as Ex. Q).  Thus,

Takara's efforts to delay these proceedings were once again unequivocally demonstrated.  Stratagene did

not agree to Takara's request for yet another delay but instead, provided Takara's counsel with the

controlling authorities demonstrating this circuit's recognition (as well as others) of the effectiveness of

Stratagene's mode of service under the Hague Convention.  (April 1, 2003 letter from Marc R. Labgold

to John B. Pegram, a copy of which is attached hereto as Ex. R).

Rather than cooperate or file an Answer in the instant action, on April 14, 2003, Takara filed the

instant motion *and* a Complaint in the United States District Court for the Southern District of California

for correction of inventorship of the '772 patent pursuant to 35 U.S.C. § 256, and for a declaratory

judgment of joint-inventorship and co-ownership of the '772 patent in a blatant and improper attempt to

deprive the patentee, Stratagene, of its choice of forum.  (*See* complaint captioned *Takara Bio, Inc. v.

Stratagene*, (S.D. Cal., Apr. 14, 2003, a copy of which is attached hereto as Ex. S)).

## III.    ARGUMENT

### A.    Takara Was Properly Served Pursuant To The Federal Rules of Civil Procedure And The Hague Convention

Rule 4(h) of the Federal Rules of Civil Procedure provides that a foreign corporation outside the judicial district may be served "in any manner prescribed for individuals by subsection (f)." Fed. R. Civ. P. 4(h).   Rule 4(f) authorizes service "by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the service abroad of judicial and extra judicial documents."  Fed. R. Civ. P. 4(f).  Because Japan is a signatory to the Hague Convention, Stratagene served Takara by sending the Complaint by registered mail pursuant to Article 10(a) of the Hague Convention.   Takara now contends that such service is insufficient.  (Mem. at 8-11).  Takara's contentions lack merit as a matter of law.

### 1.    Article 10(a) Provides For Service By Mail To Japan

Article 10 of the Hague Convention has three relevant sections:

> Provided the State of destination does not object, the present Convention shall not interfere with --
>
> (a) the freedom to *send* judicial documents, by postal channels, directly to persons abroad,
>
> (b) the freedom of judicial officers, officials or other competent persons of the State of original to effect *service* of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,
>
> (c) the freedom of any person interested in a judicial proceeding to effect *service* of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

(Hague Convention, Art. 10, *reprinted in* 20 U.S.T. 361) (emphasis added).  It is beyond dispute that Japan did not object to Article 10(a), but did object to Article 10(b) and 10(c).  Thus, it is beyond dispute that Japan does not object and as such, the Hague Convention shall not interfere with "the

freedom to send judicial documents, by postal channels, directly to persons abroad." Takara

acknowledges that Japan objected to Articles 10(b) and 10(c), which provide for "service" by judicial

officers by one State through judicial officers of the state of destination, *i.e.*, Japan, and "service" by

interested parties through judicial officers of the state of destination. (Mem. at 9). Thus, Japan did not

agree to permit its judicial officers to be used to effect service. Takara admits that Japan did not object

to the freedom under Article 10(a) to "send" judicial documents through the mail to persons abroad.

(Mem. at 9). Takara, however, then advances the strained argument that the rules of statutory

construction require that "if the drafters of the Hague Convention had meant for Section 10(a) to provide

yet another means of service, they would have used the word 'service.'" (*Id.*) Takara also alleges that

its interpretation of "send" and "service" in Article 10 "makes sense in light of the destination countries'

[Japan] local rules for service and "the understanding of its legal profession concerning the words 'send'

and 'service.'" (*Id.* at 9-10). In this regard, Takara contends that in Japanese, the words "send" and

"service" have distinct and different meanings:  send does not mean service, and Japan does not

recognize service by registered mail from a party. (*Id.* at 10). Finally, Takara asserts (relying on cases

from other jurisdictions) that Article 10(a) of the Hague Convention does not provide for service of

process by mail to Japan. Takara misleadingly asserts to this Court that these opinions represent "the

majority line of cases." (*Id*. at 10-11). To the contrary, "U.S. courts are witnessing a contemporary

trend where a majority of decisions have held that Article 10(a) allows for service of process by mail."

Alexandria Amiel, *Recent Developments in the Interpretation of Article 10(a) of the Hague Convention*

*on the Service Abroad of Judicial and Extra Judicial Documents in Civil or Commercial Matters*, 24

Suffolk Transnat'l L. Rev., 387, 388 (2001) (hereinafter "*Recent Developments*").

It is not surprising that Takara would assert that a foreign corporation should be treated preferentially compared to a U.S. corporation. That is not, however, the law in either the Fourth Circuit or the Federal Circuit. Indeed, the Court of Appeals for the Fourth Circuit, whose precedent is controlling on this issue, has stated that Article 10(a) "include[s] service by mail." *Koehler v. Dodwell*, 152 F.3d 304, 308 (4th Cir. 1998). Likewise, the majority of district courts in this circuit have followed this interpretation of Article 10(a). *See, e.g., Randolph v. Hendry*, 50 F. Supp. 2d 572, 578 (S.D. W.Va. 1999); *Hammond v. Honda Motor Co., Ltd.*, 128 F.R.D. 638, 641 (D.S.C. 1989); *Rich v. KIS California, Inc.*, No. C-87-801-WS, 1988 WL 47605, at *3 (M.D.N.C. 1988); *Weight v. Kawasaki Heavy Indus., Ltd.*, 597 F. Supp. 1082, 1086 (E.D. Va. 1984). Similarly, the Court of Special Appeals in Maryland has found that service by international registered mail is proper service under the Hague Convention. *Nicholson v. Yamaha Motor Co., Ltd.*, 566 A.2d 135, 143 (Md. Ct. Spec. App. 1990), *cert. denied*, 569 A. 2d 1242 (1990); *accord Ackerman v. Levine*, 788 F.2d 830, 839-40 (2nd Cir. 1986); *Brown v. Bandai America, Inc.*, No. 3-01-CV-0442-R, 2002 WL 1285265, at *4-*5 (N.D. Tex., June 4, 2002); *Schiffer v. Mazda Motor Corp.*, 192 F.R.D. 335, 339 (N.D. Ga. 2000); *Eli Lilly and Company v. Roussel Corp.*, 23 F. Supp. 2d 460, 474 (D.N.J. 1998); *EOI Corp. v. Medical Marketing Ltd.*, 172 F.R.D. 133, 142 (D.N.J. 1997); *R. Griggs Group Limited v. Filanto SPA*, 920 F. Supp. 1100, 1107 (D. Nev. 1996); *Patty v. Toyota Motor Corp.*, 777 F. Supp 956, 959 (N.D. Ga. 1991); *Chrysler Corp. v. General Motors Corp.*, 589 F. Supp. 1182, 1206 (D.D.C. 1984); *Gapanovich v. Komori Corp.*, 605 A. 2d 1120, 1124 (N.J. Super. Ct. App. Div. 1992); *Rissew v. Yamaha Motor Co., Ltd.*, 515 N.Y.S.2d 352, 355 (N.Y. App. Div. 1987); *Jordan v. Septa*, 708 A.2d 150, 153 (Pa. Commw. Ct. 1998).

Furthermore, it is the official position of the United States Department of State that pursuant to the Hague Convention, a plaintiff may effect service of a summons and complaint upon a Japanese

10

defendant via international registered mail.  *See* United States Department of State Opinion regarding the *Bankston* case and service by mail to Japan under the Hague Service Convention, 30 I.L.M. 260 (1991) (attached as Ex. T).

### 2.    Takara's Construction Argument Is The Epitome Of Semantics

Takara's entire motion rests in conflict with the law, and on an issue it calls a "question of construction."  Controlling precedent holds that courts "should look at the treaty's language, considering the context in which the words were used."  *Tabion v. Mufti*, 73 F.3d 535, 537 (4th Cir. 1996).  Furthermore, Treaties should be liberally construed and that to ascertain their meaning, courts may look beyond the written words to the history of the Treaty, the negotiations, and the practical construction adapted by the parties.  *Id.*; *see also Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 700 (1988); *Schiffer*, 192 F.R.D. at 338.

Initially, it is important to note that the drafters of the Hague Convention interchanged the word "service" throughout the document with words that constitute its functional equivalent.  *See R. Griggs Group Limited*, 920 F. Supp at 1105.  For instance, Article 21 of the Hague Convention provides that "[e]ach contracting State shall . . . inform the Ministry, where appropriate, of -- (a) opposition to the use of methods of transmission pursuant to Articles 8 and 10."  *Id.* at 1104 n.6.  Thus, the Convention uses the words "methods of transmission" as an equivalent to "methods of service."   As a result, Takara's contention that "service" holds a different meaning than "send" within Article 10 is incorrect -- the drafters often varied the language of the text.  *See EOI Corp.*, 172 F.R.D. at 141; *R. Griggs Group Limited*, 920 F. Supp. at 1105.

Moreover, the historical development of the Treaty itself supports a determination that service was proper here.  *See Recent Developments* at 406, *citing* The Practical Handbook on the Operation of

the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extra Judicial

Documents in Civil or Commercial Matters (Hague Conference on Private International Law) (1992) at

44.  The 1965 Convention used the French word "addressor," which translates into the English verb

"send."  *Id.*  All three predecessor Treaties use the word "addressor" in the same context.  *Id.*  Therefore,

"the meaning of the French version, which is the original language of the document, suggests that

Article 10(a) permits sending documents."  *Id.*

　　　The precise location of Article 10 within the Hague Convention also supports the conclusion that

"send" includes "service."  The purpose of the Convention is to develop a system to effectuate service of

process in other countries.  *See* Hague Service Convention, at Preamble.  (Ex. U).  Although the Hague

Convention distinguishes a central authority as the primary center for receiving service of process, the

Convention also provides alternative methods for the signatory nations.  Takara's position that Article

10(a) does not provide an alternative method of service would render the entire Article meaningless

amongst this category of alternate provisions.  *See R. Griggs Group Limited*, 920 F. Supp. at 1105

(determining Article 10(a) would be anomalous if it did not relate to service); *accord Rich*, 1988 WL

47605, at *3.  Indeed, located among fifteen Articles specifically addressing service of process, Article

10(a) would appear out of place and superfluous if it did not refer to service.

　　　Takara's contention that Article 10(a) prohibits service of process by mail because Japanese

internal law does not permit such service is also incorrect.  A country's internal law is clearly irrelevant

to Article 10(a).  *See, e.g., Eli Lilly*, 23 F. Supp. 2d at 473.  The Hague Convention Treaty sought to

create a uniform system for all the diverse signatory nations; thus, a court cannot take into the

consideration the intricacies of the signatories varying legal systems.  *Id.*  Indeed, the provisions of

12

Article 10(a) should have the same meaning to all signatories regardless of any internal law.  *See Gapanovich*, 255 N.J. Super. at 615.

Furthermore, if the authors of Article 10(a) did not intend it to permit service by mail, they would not have included the option to reject it because parties to a litigation cannot be served by mail when a country objects to subsection (a).  Most significantly, Japan had an opportunity to clarify whether it permitted service by mail during a special meeting of Hague Convention members but failed to do so.  In that meeting, Japan declared that service by mail would not infringe its sovereignty.  *See Nicholson*, 566 A. 2d at 142; *see also* 28 I.L.M. 1556, 1561 (1989).  If Japan has not objected to the use of postal services for service of process by mail (especially in light of the fact that several other countries have objected to service by mail pursuant to Article 10(a), *see EOI Corp.*, 172 F.R.D. at 138), this Court should not accept Takara's reliance upon Japanese internal legal procedures to invalidate service here.[7]  *See Weight*, 597 F. Supp. at 1085.

Finally, the Department of State interprets Article 10(a) as permitting service by mail.  (*See* Ex. T).  As the branch responsible for negotiating treaties, the Executive Branch uniquely understands what the provisions of a treaty were intended to mean.  Courts uniformly give broad deference to the Executive Branch's interpretation of international treaties; accordingly, this interpretation should be given substantial weight here.  *See, e.g., R. Griggs Group Limited*, 920 F. Supp. at 1106.

In summary, the goals of the Convention were to provide a simple and effective way to provide service of process abroad.   Serving process by mail satisfies the drafters' intent by providing an inexpensive and expeditious method accessible by everyone.  *Recent Developments* at 408.  This Court

---

[7]    "[T]his Court [should] also be persuaded by the fact that numerous United States courts have upheld service of process on Japanese defendants by direct mail, yet the Japanese government has made no efforts to amend its objections to the Convention so as to preclude service by mail pursuant to Article 10(a)." *Schiffer*, 192 F.R.D. at 338.

should follow the "preponderance of recent opinions" that permits service of process by mail under

Article 10(a).  *Id.*

      **B.**      **Stratagene Has Presented *Prima Facie* Evidence Of Personal Jurisdiction**

      To successfully rebut Takara's motion to dismiss for lack of personal jurisdiction, Stratagene

must merely make a *prima facie* showing that this Court may exercise jurisdiction over Takara.  *See*

*Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*, 166 F. Supp. 2d 432, 440 (D. Md. 2001).  In

deciding the issue, this Court must resolve all disputed facts and view all factual inferences in the light

most favorable to Stratagene.  *Id.*

      Takara bases its challenge of personal jurisdiction on the Due Process Clause of the 14th

Amendment to the Constitution of the United States.  (Mem. at. 14).  Takara argues that this Court

cannot exercise personal jurisdiction over it because neither Takara Bio nor Takara Holdings is doing

business, or has done business, in this District.  (*Id.*)  Specifically, Takara contends that its sales of

biotechnology products have been made to U.S. distributors with title passing in Japan; thus, any alleged

infringement by Takara did not take place in this District, nor did it have any impact here.  (Mem. at 15).

Of most relevance here, Takara contends that the "stream of commerce" principle does not apply

because Takara has not purposefully directed the accused products to this forum; rather, if there were

any such direction to the United States, it would be to "Takara's biotechnology products distributor in

Wisconsin and to Takara Holding's saki products distributor in California."  (*Id*. at 15-16).  These

contentions have no merit because Takara has failed to recognize -- let alone cite -- the controlling

precedent of *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994).

      As admitted by Takara, law from the Court of Appeals for the Federal Circuit governs the

"stream of commerce" analysis in a patent infringement case.  *See Beverly Hills Fan Co.*, 21 F.3d at

1564-65.  In *Beverly Hills Fan*, the Federal Circuit held that defendants, though they did not directly

ship the patent-infringing products into the forum state, nonetheless had the necessary purposeful

minimum contacts because of shipping the products, through intermediaries, into the foreign state.  *Id.* at

1565.  In that case, plaintiff was the owner of a patent for the design of a ceiling fan.  *Id.* at 1560.  One

of the defendants, Ultech, was a Chinese corporation with a manufacturing plant in Taiwan.  *Id*.  Ultech

manufactured the allegedly infringing fans on behalf of Royal, the other defendant.  *Id.*  Royal, a New

Jersey corporation, imported and distributed the fans, under the Royal brand name, in the United States.

*Id.*  The fans were ultimately being sold through retail customers by an independent retail outlet in

Virginia.  *Id.* at 1560.

Plaintiff sued in the Eastern District of Virginia alleging that defendants were infringing its

patent by selling an infringing product, through intermediaries, to customers in Virginia.  *Id.*  Like

Takara in this case, defendants filed a motion to dismiss for lack of personal jurisdiction contending that

they had no assets or employees located in Virginia, had no agent for service of process in Virginia, did

not have a license to do business in Virginia, and did not directly ship the infringing products into

Virginia.  *Id.*  It was undisputed that neither defendant in the *Beverly Hills Fan* case had directly shipped

or sold goods in the State of Virginia, for, in fact, the fans were sold by Royal to an independent

distributor outside of Virginia, Builder's Square, which subsequently distributed the fans to its retail

outlets, some of which were in Virginia.  *Id*.

The District Court held that defendants did not have sufficient minimum contacts such that

litigation in that forum would be reasonably foreseeable, and therefore, granted defendants motion to

dismiss.  *Id.* at 1561.  However, the Court of Appeals for the Federal Circuit reversed.  *Id.* at 1565.  In

reversing the District Court, the Federal Circuit applied the "stream of commerce" analysis, determining

Federal Circuit law should be applied instead of regional circuit law because of the importance of achieving uniformity in the field of patent law. *Id.* at 1564. Specifically, the court held that by using *an established distribution channel*, the defendants "knew, or reasonably could have foreseen, that termination point of the channel was Virginia." *Id.*

As *Beverly Hills Fan* and its progeny make clear, the phrase "established distribution channel" connotes a common sense definition. If markets to which defendant is distributing its products could reasonably encompass the forum state, then the court should find that the manufacturer, and everyone else in the distribution channel, has "purposefully shipped the [infringing product] into the [forum state] through an established distribution channel." *Id.* at 1565; *see also James v. Victor Co.*, 48 U.S.P.Q. 2d 1789, 1791 (D. Md. 1998); *Sonoco Prods. Co. v. Inteplast Corp.*, 867 F. Supp. 352, 355 (D.S.C. 1994); *accord Braley v. Sportec Products Co.*, No. 01-333-JD, 2002 WL 1676293 at *2 (D.N.H., July 16, 2002); *Kollmorgen Corp. v. Yaskawa Electric Corp.*, 169 F. Supp. 2d 530, 533-35 (W.D. Va. 1999); *Motorola, Inc. v. PC-Telegraph, Inc.*, 58 F. Supp. 2d 349, 355 (D. Del. 1999).

Federal Circuit precedent establishes that Takara need not directly distribute, market, sell or offer to sell the infringing products in the forum state. Rather, under the "stream of commerce" theory, Takara need only have a relationship with a distribution system such that Takara could reasonably anticipate its products being shipped, sold or offered for sale, by any member of the distribution channel into a market that includes the forum state. Here, the facts demonstrate that Takara's products are sold within this forum, and indeed, Takara has taken affirmative steps to market and sell its products in this district -- establishing jurisdiction. Moreover, Takara should have reasonably anticipated that the presence of research centers such as the NIH in Maryland would lead to its products being shipped, sold or offered for sale or used in Maryland.

16

In particular, with regard to the infringing products at issue here, Takara has set up an established distribution network through at least three companies to distribute such products throughout the United States, including the State of Maryland: (1) Takara Mirus Bio; (2) Fischer Scientific International; and (3) Serologicals Corporation (formerly Intergen). (*See* Exs. A, B, D; *see also* Maxim V. Myakishev, et. al., *High-Throughput SNP Genotyping by Allele-Specific PCR with Universal Energy-Transfer-Labeled Primers* (describing work performed using Takara Taq polymerase product and conducted by Intergen and NIH of Maryland). Indeed, such established channels have worked just as Takara intended -- infringing products are offered for sale and have been purchased in the State of Maryland. (*See* Declaration of Lynn D. Hudson, Ex. C; Ex. B at 4-7; and Ex. D at 4-6).

Takara has also created an established distribution network through Takara Sake USA (and its state-specific distributors -- including the National Dist. Co. in Maryland) to sell its sake products throughout the United States, including the State of Maryland. (http://www.takarasake.com/distributors/distributors.htm) (attached as Ex. G). This alone demonstrates Takara has taken advantage of this privileges of this forum. As with Takara's infringing products, Takara sake has been purchased in the State of Maryland. (*See* Declaration of Jasemine C. Chambers, Ex. H).

"By contracting with entities that have a market presence both nationally and world wide, [Takara] can hardly be heard to complain that it did not know the likely destination of some of its products which would include this forum." *Motorola, Inc.*, 58 F. Supp. 2d at 355; *see also Kollmorgen Corp.*, 169 F. Supp. 2d at 534. ("The court may make the reasonable inference that the sale of a large number of devices to a firm with a nationwide distribution network would generally result in the sale - or at least the use - of one of those devices in the forum state.") (citation omitted). Indeed, Takara's

"ostrich-like stand is untenable under the law." *Kollmorgen Corp.*, 169 F. Supp. 2d at 534. *Beverly Hills Fan* and its progeny are directly on point, and as in those cases, Takara should be subject to jurisdiction by this Court.[8]

### C.     Takara Has Failed To Present A Legitimate Basis For Transfer

Takara's contention that this Court should transfer the instant action to the Southern District of California pursuant to 28 U.S.C. § 1404(a) is similarly flawed. (Mem. at 16). As the movant, Takara bears the burden to show that "the balance of convenience and interest of justice is strongly in [its] favor." *Dow v. Jones*, 232 F. Supp. 2d 491, 499 (D. Md. 2002) (citation omitted). Indeed, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Id.* Takara has failed to make anything close to the required showing.

Courts consistently hold that a plaintiff's choice of forum is afforded substantial deference if the forum is selected for some legitimate reason. *See, e.g., Penn-Plax, Inc. v. L. Schultz, Inc.*, 988 F. Supp. 906, 912 (D. Md. 1997). In this case, there are at least two legitimate reason Stratagene sued Takara in the instant forum. First, pursuant to controlling Federal Circuit precedent, the tort of patent infringement occurs at the place of infringement. *See Beverly Hills Fan Co.*, 21 F.3d at 1571. As noted above, infringing Takara products are both offered for sale and have been purchased in this forum. (*See* Ex. C; *see also* Exs. A, B, D). Thus, Takara has committed patent infringement in Maryland and is subject to jurisdiction therein.[9]

---

[8]     Alternatively, if this Court believes that additional information would be helpful in demonstrating Takara's contacts with this forum, Stratagene respectfully requests the Court stay the instant motion and permit Stratagene to conduct limited discovery as to the issue of personal jurisdiction and then file a supplemental brief providing additional facts to demonstrate that Maryland is a proper forum for this case.

[9]     Similarly, Takara's contention that this case involves a mere local California controversy is wrong. *See Bering Diagnostics GmbH v. Biosite Diagnostics, Inc.*, No. 97-501MMS, 1998 WL 24354, at *7 (D. Del., Jan. 6, 1998) (dispute over infringing product that is sold worldwide "can hardly be described as a local California controversy.") (citation omitted).

Second, Stratagene sued Takara in this district because of the currently ongoing related case of *Stratagene v. Invitrogen Company*, No. DKC 01-3566, where Stratagene is suing Invitrogen for infringement of the same patent-in-suit -- the '772 patent. Takara makes the condescending assertion that this Court should transfer the instant action to the Southern District of California because that court, in general, has more experience with intellectual property cases. (Mem. at 20-21). However, in this case, retaining the instant action would promote judicial economy and the defenses are the same in each case: the '149 patent to Barnes, as demonstrated by Takara's complaint regarding the '772 patent that it filed the same day as the instant motion. *See Penn-Plax*, 988 F. Supp. at 912 (later action filed in California "could have been (and still can be) filed as a counterclaim [or affirmative defense] in this action"). In the interests of judicial economy and to avoid the possibility of inconsistent adjudications, Stratagene's choice of forum should be given substantial deference.[10]

Takara also makes much ado about the location of documents pertaining to the invention of the patent-in-suit, and the convenience and compulsory power of the California court over party witnesses. (Mem. at 18-19). Yet, none of these arguments are even relevant here -- courts hold that foreign corporations such as Takara "are no more inconvenienced by a trip to one state than another." *Miller Pipeline Corp. v. British Gas*, 901 F. Supp. 1416, 1425 (S.D. Ind. 1995) (denying British defendant's motion to transfer venue). Similarly, Takara Bio and Takara Holdings are both large international companies with large revenues, as such the relative economic burden upon them in litigating in Maryland is minimal. *See Bering Diagnostics GmbH*, 1998 WL 24354, at *6. Finally, even assuming

---

[10]     Takara's contention that Stratagene sued in this District out of convenience only for its lawyers is patently absurd. None of Stratagene's lawyers are located in Maryland. The reason for the filing in Maryland stems from the fact that the related sister case was originally brought in Maryland because the defendant in that case, Invitrogen Corporation, had its principal place of business within this judicial district: 9800 Medical Center Drive, Rockville, Maryland 20849-6482. (Assuming this address for an interim period as its principal place of business after its purchase of Life Technologies, Inc.).

19

*arguendo* that Takara's arguments are relevant to a foreign defendant with large revenues, these contentions are not sufficient to present the required "strong" showing necessary to deprive the patentee of its chosen forum.

With respect to Takara's document contention, modern courts often discount the location of documents because "[t]he relevant documents, books, and records can be easily transported." *Bering Diagnostics GmbH v. Biosite Diagnostics, Inc.*, No. 97-501MMS, 1998 WL 24354, at *7 (D. Del., Jan. 6, 1998). Moreover, even if such location were relevant, all of the relevant documents Stratagene will produce are already located in Stratagene's counsel's offices in McLean, Virginia, in view of the pending litigation already before the Court. (Labgold Decl. at ¶ 8, Ex. P).

With respect to Takara's witness contention, courts hold that the convenience of party witnesses are irrelevant. *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 203 (D. Del. 1998) (convenience of party witnesses is irrelevant as such witnesses can be compelled to testify). As Takara has only identified one non-party witness, Dr. Barnes, who resides in Missouri and, as admitted by Takara, "[t]ravel to either coast would be approximately equally convenient for him," (Mem. at 19), Takara has failed to make a strong showing that the instant action should be transferred. This Court should afford substantial deference to Stratagene's forum choice and retain venue in this district.

## IV. CONCLUSION

For the foregoing reasons, this Court should deny Takara's motion to (1) quash or dismiss for inadequate service of process pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure, (2) dismiss the instant action for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, or (3) transfer the instant action to the United States District Court for the Southern District of California.

Alternatively, if this Court does not find that Stratagene has presented a *prima facie* case for personal jurisdiction over Takara, Stratagene respectfully requests that this Court stay the instant motion and permit Stratagene to conduct limited discovery as to the issue of personal jurisdiction, and then file a supplemental brief to discuss the jurisdictional facts revealed by such discovery.

Dated this 1st day of May, 2003.

Respectfully submitted,


_____/s/ Kevin M. Bell_____
Marc R. Labgold
Kevin M. Bell (MD Bar # 14382)
Scott A.M. Chambers
PATTON BOGGS LLP
8484 Westpark Drive
McLean, Virginia 22102

Richard J. Oparil (MD Bar # 13063)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037-1350

*Attorneys for Plaintiff Stratagene*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that they caused the foregoing to be served in the manner indicated on the following attorneys of record this 1st day of May, 2003.

       Linda Liu Kordziel, Esq.    **(Via Hand Delivery)**
       Fish & Richardson P.C.
       1425 K Street, N.W., 11th Floor
       Washington, D.C.  20005


                            /s/
                      Kevin M. Bell